# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00992-COA

JOSHUA THAMES                                                        APPELLANT

v.

STATE OF MISSISSIPPI                                                 APPELLEE

DATE OF JUDGMENT:            05/21/2019
TRIAL JUDGE:                 HON. DAVID H. STRONG JR.
COURT FROM WHICH APPEALED:   PIKE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: SCOTT STUART
DISTRICT ATTORNEY:           DEE BATES
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 07/28/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1.     A Pike County Circuit Court jury convicted Joshua Thames of armed robbery and conspiracy to commit armed robbery of the Piggly Wiggly grocery store in Summit, Mississippi, where he worked as an assistant manager. The jury declined to sentence Thames to a term of life in prison. Therefore, for the armed robbery charge, the trial judge sentenced Thames to a term of twenty years in the custody of the Mississippi Department of Corrections, with five years suspended and fifteen years to serve, placed Thames on five years of post-release supervision, and ordered him to pay a $5,000 fine. For the conspiracy

charge, the trial judge sentenced Thames to serve five years to be served concurrently to the first sentence.

¶2.    Thames now appeals, arguing the trial court improperly disallowed Thames from testifying about what his instructions were if the store were robbed. Thames claims this denial prevented him from presenting defense evidence. We find no reversible error and affirm.

## STATEMENT OF FACTS

¶3.    On August 11, 2018, between 8:45 p.m. and 9:00 p.m., Patrick Burns entered the Piggly Wiggly grocery store in Summit, wearing black clothing, a camouflage mask, and black gloves, brandishing a handgun. Inside the store, three teenage employees were preparing for the store's closing at 9:00 p.m.: Eli Schwartz, a stocker; Brianna Dickerson, a clerk; and Thames, the assistant manager. Dickerson saw Burns enter the store and demand money from Schwartz and Thames; he kept his gun pointed primarily at Schwartz. Burns, remaining in the front of the store, told Thames and Schwartz to put the money in a black duffle bag. Meanwhile, Dickerson ran to the back of the store and hid in a freezer. After a few moments, she went to the other side of the store, found a phone, and called 911.

¶4.    Coincidentally, during this time Officer William Harris, a longtime patrol officer for the Summit Police Department, was patrolling the area. He was wearing a body camera, and a video of the evening's events was entered into evidence at trial. In the video, Officer Harris pulled into the Piggly Wiggly parking lot. There were no vehicles in the lot, but there were still several empty buggies that had not been retrieved. He testified this was unusual

2

for that time of night. Inside the store, the lights were on, and it looked like the employees were still present. Additionally, he noticed a vehicle parked in an alley adjacent to the store. Officer Harris shined his light in the vehicle and saw an individual behind the wheel, which was also unusual.

¶5.     Deciding to perform a "business check," Officer Harris parked his patrol vehicle and walked to one of the two front doors to the store, which was locked. Officer Harris called his partner, Officer Brian Ellison, for back up. Through the glass doors, Officer Harris saw Thames kneeling on the floor near the front doors removing money from the store safe. Initially, Thames saw but ignored Officer Harris. When the officer knocked on the door, Thames, looking tentative, gave Officer Harris a "thumbs up" sign through the door but did not open it. Officer Harris, unconvinced, then pounded on the door, insisting that Thames open it. Thames hesitated. Officer Ellison arrived in less than a minute to observe Thames reluctantly opening the door with a key. Officer Harris drew his weapon, entered the store, and discovered Burns hidden behind an ice machine in his robber attire, holding a nine-millimeter handgun. A black duffle bag later found to contain about $10,000 in cash, coins, and some cigarette cartons was on the floor between Burns and Thames. Burns relinquished his handgun and was arrested.

¶6.     Additional law enforcement officers arrived on the scene, as well as a woman in a truck. Officer Ellison learned the woman had come to pick up Thames from work; she, interestingly, had the same address and last name as the suspect Burns. Upon further questioning, Officer Ellison learned she was Burns's wife, and Thames was living with the

3

couple. This information prompted Officer Ellison to remark that the robbery was an "inside job." Burns's wife, however, was unaware that her husband was even at the store, let alone that he had just been caught robbing it.

¶7.     Both Dickerson and Schwartz testified to numerous discrepancies that evening regarding the store's usual closing procedures and end-of-day routines. At about 8:45 p.m., Thames interrupted Schwartz's re-stocking task and summoned him to the store's office. Thames told Schwartz to announce over the store's intercom that the store was closing fifteen minutes early and for customers to complete their shopping. Schwartz testified this had never occurred before, but Thames had said he was not feeling well earlier that day. Normally Schwartz would be sweeping, re-stocking shelves, or helping Dickerson with some lifting. Dickerson testified that Thames told her that Schwartz could help later.

¶8.     Additionally, the doors in the back of the store were locked early. Customers used two front doors—an "in" door and an "out" door; however, the "out" door was locked instead of the usual "in" door, even after the customers departed. Usually, the shopping carts were removed from the parking lot before the doors were locked. Thames also asked Schwartz to stay in the office with him while he counted the money in the tills.

¶9.     Schwartz testified that during the robbery, Burns came into the store and instructed them to put the store's money in a black duffle bag. On Burns's instruction, Thames locked the "in" door and proceeded to retrieve money from the cash registers. Thames then emptied the store safe and extra tills hidden in the office, which Schwartz testified the robber had no reason to know about. Schwartz testified the store's policy is for employees to comply with

4

a robber's demands.

¶10.  Brandon Givens, the general manager of the Piggly Wiggly store, arrived at the scene soon after Burns was arrested.  Givens testified that the employees had been told the store's robbery protocol was to "give them what they want."  He also stated the closing protocol had not been followed the night of the robbery, and the store never closes early.  On the scene, Givens claimed Thames was a trustworthy employee and a hard worker; he had just been promoted to assistant manager a few weeks previously, after two years of employment.  Initially, Givens was not convinced Thames could have been involved in the robbery, but by trial, Givens testified he was "duped" by Thames.

¶11.  Givens testified about an incident that occurred about one week before the robbery when he had seen Burns at the store.  At closing time, Thames had called Givens for permission to alter closing procedures.  Thames said his "Uncle Pat," Patrick Burns, had borrowed his truck and had the store keys, which were on the same key ring as his truck keys.  Thames had asked Givens if he and another employee could stand outside the front door and tell people the store was closed until Burns could bring Thames his keys.  Givens thought it was a "bad idea" and stated he would come to the store to lock it up immediately.  Givens arrived before Burns; thus, a plan to rob the store was aborted.[1]  Givens knew Burns was not really related to Thames, but they had lived together since Thames's mother had been forced to move from her trailer park.  Givens also knew Thames was best friends with

---

[1] At trial, Burns divulged that this was the first of three robbery attempts by him and Thames.  They aborted a second attempt as well.  The third robbery attempt was on August 11.  Before Thames's trial, Burns pleaded guilty to armed robbery and conspiracy to commit armed robbery.  He was sentenced to twenty years with five years suspended.

his "Uncle Pat's" son, Aaron Granger, who frequently came to pick up Thames from work.

¶12.    As police questioned individuals at the scene, they made the connection between Thames, Burns, and Granger. However, Thames did not initially identify Burns, nor did Burns implicate Thames that night. Burns merely admitted to the robbery and said, "I f**ked up."

¶13.    Police discovered Granger had been the individual in the vehicle parked in the alley. They requested Thames call Granger to return to the scene immediately. Granger claimed he had come to pick up Thames from work but left when he saw Officer Harris's patrol vehicle because Granger was smoking marijuana. Granger had been in the parking lot at the same time Burns was robbing the store. At the scene, Burns claimed that his son, Granger, had not given him a ride to the store but that he had walked from home.

¶14.    As the investigation that night wore on, Thames finally admitted that he lived with Burns but that he had not recognized him due to the mask. Thames stated he had not acknowledged Burns because Burns was "nuts," and he feared him. These facts furthered investigators' suspicions about Thames's involvement. In addition, a deputy sheriff on the scene, who personally knew Burns and his family, offered information to investigators that Burns had had mental problems in the past and had recently fallen on hard financial times—he had lost his job and been denied disability benefits. She was also convinced that Granger, Thames, and Burns were all "in on" the robbery.

¶15.    Burns did not implicate Thames and Granger in the robbery until later. At trial, Burns testified that he and Thames had devised the robbery plan for August 11. Burns would drive

6

to the store and arrive at 9:00 p.m. Thames would have both Schwartz and Dickerson in the front of the store to prevent them from calling the police. Burns would rob the store, drive home, drop the money off, and either he or Granger would return to pick up Thames. Burns also claimed that the robbery was Thames's idea after he came home from work one day and commented that it was store policy to surrender the store's money to robbers. Burns testified that Thames asked if he wanted to rob the store, and Burns said "yes." Burns testified that Thames had lived with Burns and his wife a few months prior to the robbery. Also, Thames and Granger were best friends.

¶16. Granger testified at trial that he was aware Thames and Burns had discussed robbing "the Pig" in the past. In mid-July, when the subject came up at a barbecue, Granger thought they were crazy, and told them "don't sh*t where you lay." He attested to the fact his parents had dire financial problems. However, Granger testified that he had no knowledge of the plans to rob the store on August 11; he merely agreed to be the "third man" and just drive.[2]

¶17. Granger testified to the following version of events on August 11, 2018. Granger and Burns drove to "the Pig" before closing time to pick up Thames, and his father entered the store. When Officer Harris shown his light on Granger parked in the alley, Granger was "rolling a blunt." After that, Granger testified things "got fuzzy." Granger "realized what was going on" and was "in shock." He fled the scene but was later called back by Thames

---

[2] Granger pleaded guilty to conspiracy to commit armed robbery, with the armed robbery charge dismissed, in exchange for his testimony against Thames. At the time of Thames's trial, Granger had not been sentenced.

to speak to law enforcement. The next day, after his father was arrested for the robbery, Granger and Thames "were kind of worked up." Thames "started getting scared" and became suicidal over the prospect of "getting caught." Granger claimed he and Thames decided to lie to investigators and say Burns had threatened them into helping rob the store—a claim Burns denies. Granger maintained this story until pleading guilty. Granger also denied knowing about the prior robbery attempts.

¶18. Thames testified in his own defense. He claimed Burns was abusive toward his wife, his son, and Thames. Burns took drugs and was moody. Thames testified Burns came up with the idea for the robbery. During a barbecue in mid-July, Burns, who was high on drugs, went inside and returned with an AR-15 firearm and a nine-millimeter pistol. Burns threw the weapons on the table and said, "I'm going to rob the Piggly Wiggly, and if you tell anybody I'm going to kill you . . . and your family." Granger was not present during this incident. Thames thought Burns was "full of sh*t" because Burns joked about robbery frequently, but he later came to fear Burns. Thames denied that store-closing procedures were altered and denied any involvement in the robbery.

## ANALYSIS

¶19. Thames raises one issue on appeal. During Thames's direct examination, defense counsel asked Thames about his instructions as assistant manager regarding robberies, as well as the procedure for counting money in the manager's office. The State objected to the testimony as hearsay, and the trial court sustained the objections. Thames argues he was prejudiced because the trial court's ruling prevented him from presenting evidence in his

8

defense.

¶20.    The trial court's admission or exclusion of evidence is reviewed for an abuse of discretion. *McGriggs v. State*, 987 So. 2d 455, 457 (¶3) (Miss. Ct. App. 2008). "Even if this Court finds an erroneous admission or exclusion of evidence, we will not reverse unless the error adversely affects a substantial right of a party." *Id.* "'Hearsay' is a statement that . . . the declarant does not make while testifying at the current trial or hearing . . . , offer[ed] in evidence to prove the truth of the matter asserted in the statement.'" M.R.E. 801(c). Mississippi Rule of Evidence 103(a)(2) provides that "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . [a] party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Finally, it is well established that "[a] criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory." *Terry v. State*, 718 So. 2d 1115, 1121 (¶28) (Miss. 1998) (citing *Keys v. State*, 635 So. 2d 845, 848-49 (Miss. 1994)).

¶21.    During Thames's direct examination, his counsel asked him about the alleged "strange occurrences" during closing the night of the robbery that the other witnesses had referenced, such as locking doors in a different manner and having Schwartz in the office. Counsel was trying to elicit testimony from Thames that these procedures were not out of the ordinary but that Thames had been trained to close the store in this manner. The defense sought testimony that Thames was to comply with any robber's demands and that he was

trained not to count money from the clerk's tills alone, which was why Schwartz was in the office with him. Testimony on these matters, Thames argues, if allowed, would have shown his behavior was not to assist in the robbery:

> Q.     Did you lock the back doors they're talking about?
>
> A.     Yes, sir. The manager that trained me, Richard, told me he locks them five to ten minutes before closing.
>
> Q.     Okay. What did your manager [Givens] tell you the week before this robbery?
>
> BY [THE PROSECUTOR]: Objection to hearsay.
>
> BY THE COURT: Sustained. You cannot answer that, Mr. Thames.
>
> . . . .
>
> Q.     What have you ever been told about locking up at night?
>
> BY [THE PROSECUTOR]: Objection. The answer will be based on hearsay.
>
> BY THE COURT: That all calls for a hearsay response. . . . Ladies and gentlemen, hearsay is an out-of-court statement intended to prove the truth of the matter asserted and it is not allowable testimony for the jury.
>
> . . . .
>
> Q.     So, let me ask you this. So you locked the outer door. There's a big to-do about calling up [Schwartz] to the front. Please explain why you called [Schwartz] up to the front.
>
> A.     Because Richard Sanders, the manager that trained me, got on to me a couple of weeks before and told me that whenever I'm counting down tills in the office –
>
> BY [THE PROSECUTOR]: Objection. Hearsay.
>
> BY THE COURT: Sustained. Hearsay.

10

Q.      *You can't say what somebody told you.* Just . . . tell this jury why you asked [Schwartz] to come up and watch you count the money . . . .

A.      To make sure everything was correct and I was doing it right. And to make sure I didn't take anything out the till to make it short.

Q.      Okay. And were you taught that?

A.      Yes, sir.

Q.      *Is that unusual?*

A.      No, sir.

Q.      Now if you would, just kind of explain your version of August the 11th, the robbery. Explain to this jury what happened that night.

A.      A few minutes before closing somebody walked in with a gun and a mask. I was sitting in the office with Eli, the former employee, and we were counting down his till when the man walked in. He pointed the gun towards the office and he said to put the bills in the bag. *So it clicked with me because the protocol that Piggly Wiggly has, comply.*

(Emphasis added).

¶22.   We agree that Thames's prospective testimony about his training and instruction did not constitute hearsay and should have been allowed; however, we find no prejudice resulted from this ruling. Testimony about information a witness receives is not hearsay if it is offered to explain a subsequent course of action of the witness based on that information. *Swindle v. State*, 502 So. 2d 652, 658 (Miss. 1987); *McGowan v. State*, 375 So. 2d 987, 990 (Miss. 1979). Here, the out-of-court statements were not offered to prove the truth of Thames's assertions but rather to show "information acted on" (that is, his behavior that evening was consistent with his training and instruction).

¶23.   Thames's defense counsel, however, did not make this argument before the trial

11

court. Further, counsel did not make an offer of proof outside the jury's presence and explain the purpose of the testimony, which would have assisted the trial court in its ruling. In fact, defense counsel seemed to agree with the trial court that Thames's testimony about why Schwartz was with him in the office would be hearsay. He corrected Thames on the stand: "You can't say what somebody told you." It is well established that "[i]ssues not raised below may not be raised for the first time on appeal . . . ." *Strohm v. State*, 923 So. 2d 1055, 1057 (¶5) (Miss. Ct. App. 2006) (citing *Stringer v. State*, 279 So. 2d 156, 158 (Miss. 1973)). Therefore, Thames waived this argument.

¶24. Moreover, the trial court's denial of the prospective statements did not prejudice Thames's defense because the same testimony was presented by Thames or other witnesses. Regarding the instructions to comply during the event of a robbery, Thames testified moments later, when recounting what happened the night of August 11, that it was store policy to comply with a robber. Further, Schwartz and Givens testified that complying with a robber's demands was store policy. Burns also testified that Thames came home one night after a store meeting and told him if the store were ever robbed, not to argue but to "give them what they want. It's not worth people losing their lives."[3]

¶25. Regarding counting the till while in Schwartz's presence, Thames admits that he was able to testify that he was trained by Piggly Wiggly to do so. Also, Thames explained that Schwartz was present to "make sure everything was correct and I was doing it right." Thames further testified he "was taught that," and it was "not unusual."

---

[3] Burns testified that the same evening, Thames asked him if he wanted to help rob the store.

12

¶26. Thames now contends the trial court erred in preventing him from testifying about who taught him not to count the money alone. Again, this objection was not raised before the trial court and is waived. Further, we fail to see how this information would further Thames's defense. He was able to testify before the State objected to the hearsay that manager Richard Sanders trained him on counting the tills, and the trial court did not instruct the jury to disregard this statement.

¶27. While Thames's prospective testimony was not hearsay, the information defense counsel sought to elicit was established by the testimony of other witnesses or Thames himself. Thames's defense was not prejudiced, and his substantial rights were not adversely affected. Other evidence supporting his defense and theory of the case that he did not participate in the robbery or conspire to rob the store was presented to the jury, which rejected that evidence. This issue is without merit. Accordingly, we affirm Thames's conviction and sentence.

¶28. **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**